432-07/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MOUNT IDI MARITME LTD. and FELIZ
MARITIME COMPANY LIMITED,

              Plaintiffs

    - against -

BRITANNIA BULK PLC  f/k/a BRITANNIA
BULK LIMITED,

              Defendant

---

07 cv _____

**VERIFIED COMPLAINT**

Plaintiffs MOUNT IDI MARITME LTD. ("MOUNT IDI") and FELIZ MARITIME COMPANY LIMITED ("FELIZ") (collectively "OWNERS") by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant BRITANNIA BULK PLC formerly known as BRITANNIA BULK LIMITED (collectively "BRITANNIA" or "CHARTERERS"), alleges upon information and belief as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff MOUNT IDI was and still is a foreign business entity duly organized and existing under the laws of Malta with an address at 18/2 South Street, Valetta, Malta.

3.    At all times relevant hereto, Plaintiff FELIZ was and still is a foreign business entity duly organized and existing under the laws of Malta.

4.    At all times relevant hereto, and upon information and belief, BRITANNIA BULK LIMITED was a foreign business entity organized and existing under the laws of a foreign country which now operates under the name BRITANNIA BULK PLC and as the successor in interest to BRITANNIA BULK LIMITED with a place of business at Dexter House, 2 Royal Mint Court, London, EC3N 4QN, United Kingdom.

5.    Defendant BRITANNIA utilizes other entities as paying or funding agents for purposes of receiving, holding and/or transferring funds, including but not limited to Goodmayes Commercial Limited.

6.    On or about March 8, 2004, Plaintiff, MOUNT IDI as Owners of the M/V AKRATHOS, entered into a maritime contract of time charter party with Defendant BRITANNIA, for a minimum period of 11 months to about 15 months.  A copy of the charter party and additional rider clauses is attached hereto as **Exhibit A**.

7.    On June 17, 2005, Plaintiff FELIZ purchased the vessel and the remaining charter from MOUNT IDI.

8.    The vessel was duly delivered into service under the charter, and hire in the amount of $607,617.33 was earned.

9.     Contrary to its obligations under the charter party, CHARTERERS wrongfully remitted only $484,206.65 of the amount due and outstanding, alleging that the vessel was off hire due to a crane breakdown, and therefore, it was not required to pay $123,410.68 of the amount due.

10.     In further contravention of CHARTERERS charter party obligations, CHARTERERS failed to provide a safe port, berth and/or anchorage, resulting in damages to the vessel's cranes and losses to Owners for which CHARTERERS are liable.

11.     Based upon the foregoing, OWNERS have claims for damages relating to CHARTERERS' breach of its obligations under the charter party:  (1) failing to pay hire in the amount of $123,410.68 (or alternatively, wrongfully deducting hire); (2) cost of repairing the vessel's cranes in the amount of $23,032.90; and (3) payment made to stevedores in the amount of $4,000.

12.     The charter party provides for the application of English law and all disputes between the parties are to be resolved by arbitration in London, where arbitration has already been commenced and OWNERS specifically reserve its right to arbitrate the substantive matters at issue and without waiver of any claims or defenses in the pending arbitration.

13.     Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

14.     This action is brought in aid of the London arbitration against CHARTERERS, and to obtain security both for the claims as outlined above and for accrued and anticipated attorney fees and arbitral costs in the arbitration -- the accrued fees and costs of which total €20,000 ($27,000) and the anticipated fees and costs which are estimated to total an additional

€15,000 ($20,500) -- which amounts are recoverable as part of the Plaintiff's claim under the governing English law.

15.     This action is also brought to obtain security for interest for the principal amounts due plus the accrued fees and costs totaling $177,443.58, which with interest at the rate of 7% through the estimated completion of the arbitration in 2 years total $203,861.70.

16.     Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of $224,361.70.

17.     Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in either of its names to wit: BRITANNIA BULK PLC or BRITANNIA BULK LIMITED and/or in the name of its paying and/or funding agent GOODMAYES COMMERCIAL LIMITED at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff prays:

a.      That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.      That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $224,361.70 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in either of its names or as may be held, received or transferred for its benefit, including those in the name of its paying or funding agent at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.      That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        September 7, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York )
       ) ss.:
County of New York )

  PAMELA L. SCHULTZ, being duly sworn, deposes and says as follows:

  1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

  2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by English solicitors representing our client.

  3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

             Pamela L. Schultz

Sworn to before me this
7TH day of September 2007

    Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 08

ALANSONS SHIPPING LIMITED
Charter House, 117 Greenstead Road
Colchester, Essex CO1 2ST
Telephone: (01206) 871919
Fax: (01206) 871901
Telex: 987344 ALCHAR G
E-mail: chartering@alansons.net

# Time Charter



### GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913–Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  This Charter Party, made and concluded in *LONDON* ........................ 8th day of *March* .................... 19 *2004*

2  Between *MOUNT IDI MARITIME LIMITED OF VALETTA, MALTA*

3  Owners of the good *Maltese* Flag    Steamship/Motorship " *AKRATHOS* "    of .......................... indicated horse-power

4  of *16,172* ............ tons gross register, and *8,573* ............ tons net register, having engines of .......................... indicated horse-power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed *Bureau Veritas I 3/3 E*

6  at .......................... of about *1,835,788 cubic feet grain/ 947,698* cubic feet bale capacity, and about *25,819 Metric* ............ tons of *2240 lbs*

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of *18.54 Metres* feet .......................... inches on salt water.    Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about .......................... tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about .......................... knots on a consumption of about .......................... tons of best Welsh coal best grade fuel oil best grade Diesel oil

*Description See Clause 28*

11  now

12  .......................... and *BRITANNIA BULK LTD* .......................... Charterers of the City of *SETCHELLES*

13  Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *A Timecharter period of minimum 11 months to about 15 months (about meaning +/- 30 days) in Charterers' option via safe port(s), safe*

15  *berth(s), safe  anchorage(s)* .......................... within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party *(occurrence of delivery of the vessel by Charterers shall not prejudice their rights against Owners*

18  Vessel to be placed at the disposal of the Charterers, *at, on dropping outward pilot "LIFENG" Shipyard Shanghai, anytime day or night Sundays and*

19  *Holidays included*

20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), to

21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be

22  ready to receive *any permissable* cargo with clean swept holds *and free from rust scale, flakes and residues of previous cargo* and tight, staunch, strong and

23  in every way fitted for the service, having water ballast, winches and

24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

25  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

26  dise, including petroleum or its products, its proper containers, excluding   *See Clause 51*

27  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

28  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port(s), and/or *safe berth(s), safe*

29  *anchorage(s) ports in British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or*

30  Mexico, and/or South America   Always within Institute Warranty Limits - See also Clause 57   and/or Europe

31  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but including Magdalena River, River St. Lawrence between

32  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

33  ..........................

34  ..........................

35  as the Charterers or their Agents shall *direct,* on the following conditions:

36  1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *and all other charges*

*related to the Master, Officers and crew* shall pay for the

37  insurance of the vessel, also for all the cables, deck, engine-room and other necessary stores, including boiler water *also for garbage removal.  However if*

*consultants shee for Ullage/ Draft Survey, Lab-locator Oil, Bottom-survey* maintain her clean and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

This is a computer generated NYPE of form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original approved document shall apply. Contracted thereon no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.



**EXHIBIT**

**A**

39  2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44  ~~of six months or more~~

45  Charterers are to provide necessary dunnage and shifting boards, *lashing material*, also any extra fittings requisite for a special trade or unusual
    cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage therein.

48  ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ _____ tons and not more than
50  _____ tons and is to be re-delivered with not less than _____ tons and not more than _____ tons. *See Clause 47*

51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S.$15,000 per day prorata including overtime in*
52  _____ United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53  ~~stores, to_____ summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *vessels trading limits, Port to Charterers option as per Clause 59 anytime day or night Sundays*
56  *and Holidays included* unless otherwise mutually agreed. ~~Charterers are to give Owners not less than _____ days~~
57  ~~notice of vessels expected date of re-delivery, and probable port,~~ *See Clause 58*

58  5. Payment of said hire to be made in New York *Piraeus* in cash in United States Currency, *every 15 days* semi-monthly in advance, and for the last
    half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, *except Charter periods* as it
    becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *at 8am vessel's delivery* 7 a.m. on the
    working day
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.

68  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf *or anchorage* or place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at *North America* such places where it is customary for similar size vessels to
    safely
70  lie aground.

71  7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74  ~~paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or other expenses are~~
75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow *lash/unlash, secure/unsecure,* and trim *and discharge* the cargo at their expense under the supervision of the Captain,

This is a computer generated WYPC All form. Any insertion or deletion to the form must be clearly visible, in event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Inremarks resolves no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

2

79  who is to sign, *or is to authorize Charterers and/or their Agent to sign* Bills of Lading for
80  cargo as presented, in conformity with Mate's or ~~Tally Clerk's~~ receipts. *See Clause 63*

81  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. ~~Charterers paying at the~~
84  ~~rate of $1.00 $18.00 per day. Owners to victual Mates and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally-~~
85  ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. Charterer's to pay US$1,500 lumpsum for~~
~~owners piovision victualling and entertainment per month hereto.~~

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct *Log in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.

90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of _____~~
92  _____
93  ~~on giving written notice thereof to the Owners or their Agents _____ days previous to the expiration of the first named term, at any declared option.~~

94  14. That if required by Charterers, time not to commence before *0600 hours 15th May, 2001* and should vessel
95  not have given written notice of readiness on or before *31st May, 2001* but not later than *4 p.m. 2400 hours.*
96  Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15. That in the event of the loss of time from deficiency *of labours, accidental or default of Master, Officers or crew or deficiencies of* of men or stores,
fire, breakdown or damage to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full *use of the vessel to the Charterers* working of the vessel, the payment of hire *and overtime* shall cease for the time thereby lost *and all
direct extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners account* and if upon the voyage the
speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. See Clause 29~~

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116  York-Antwerp Rules *1994 and any subsequent amendments thereto to be applied* 1974, at such port or place in the United States as may be selected by the
carrier, and as to matters not provided for by these

This is a computer generated NYPE 46 form. Any insertion or deletion to this form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original approved document shall apply. Gencon's Indorse no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

3

117 Rules, according to the laws and usages of the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agent may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shipper, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and to remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money.

126       In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127 whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131 ships belonged to strangers.

132       Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133       20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity; and the
134 cost of replacing same, to be allowed by Owners.

135       21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138 _____
139 _____
140       22. Owners shall maintain the gear of the ship as *described in the description Clause* listed, providing gear (for all derricks) capable of handling lifts up
to three tons, also

141 providing ropes, *runners and* falls, slings and blocks *as on board*, If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary
gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide *free of expenses sufficient lighting with vessels
lights. Hold clusters to permit work at all hatches at the same time* on the vessel (at same and all for

143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel.

145       23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.

151       24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc.," in respect of all cargo shipped under this charter so as to save the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder

155       U. S. A. Clause Paramount

156       This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

This is a computer generated NYPE 46 form. Any insertions or deletions to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Commercial terminal not responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form

4

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging *Vessel not to follow ice breakers or treds in any event where lights lamps are likely to be*

*with drawn due to bad weather/ice*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel *her seaworthiness and seatsurance, acts of Pilots, Trebaots, Docrews,* insurance, crew, and all other matters, same as when

trading for their own account.

172 27. A commission of 3142 *1.25* per cent is payable by the Vessel and Owners to *Rainbow Shipping Ltd, London*

173 *and 1.25 per cent to Simcoms Shipping Ltd, Colchester*

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of 3142 per cent payable to *Charterers* _____ on the hire earned and paid under this Charter.

*Additional Clauses 29 to 165, as attached, are deemed to be incorporated in this Charter Party.*


This is a computer generated NYPE 46 form. Any insertion or deletion in the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original approved document shall prevail. Deletions cannot be responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

5

## Additional Clauses to M.V. "Akrathos"
## C/P dated 8th March, 2004

Clause 29.

M/V AKRATHOS (ALL DTLS ABT)
ST/BULKCARRIER BLT 1981
SUMMER DWAT 25 817 MT ON 10,56  M SW DRAFT
WINTER DWAT 25 031 MT ON 10,34  M SW DRAFT
TROPICAL DWAT 26 550 MT ON 10,77  M SW DRAFT
FW ALLOWANCE 24,2 CM.
MALTESE FLAG BUILT 15.6.1981
7 HOLDS/7 HATCHES
LOA: 184.6 M
BEAM: 22.80 M
DEPTH: 14,15 M (MLD)
GRAIN: 1.035,186 CBFT
BALE:  967,698 CBFT
CRANES: 4 X 16 TONS

ORE STRENGHTHENED 1+3+5+7 OR 2+4+6 MAY BE EMPTY
VSL'S DEADWEIGHT IS REDUCED TO 24574 MT ON 10.21 M DRAFT IF ENTIRE CARGO IS
LOADED IN HOLDS 1+3+5+7 (WITH 2+4+6 REMAINING EMPTY), OR IF ENTIRE CARGO IS
LOADED IN HOLDS 2+4+6 (WITH 1+3+5+7 REMAINING EMPTY).

VESSEL IS BV ICE CLASS III FOR A MAXIMUM DRAFT OF 10,21 M.

VESSEL'S HATCH SIZES:
NO.1 13.30 M X 10.00 M
NO.2+4+6 10.66 M X 11.44 M
NO.3+5+7 13.12 M X 11.44 M

HOLDS FLAT FLOOR AREA:
NO.1 17.45 M X 16.00 M (AT THE FORE END IT TAPERS TO 9,80 M)
NO.2 10.60 M X 16.00 M
NO.3 18.00 M X 16.00 M
NO.4 10.60 M X 16.00 M
NO.5 18.00 M X 16.00 M
NO.6 10.60 M X 16.00 M
NO.7 18.80 M X 16.00 M (6 M  FROM FORE BULKHEAD TAPERS TO 13,20 M)

BUNKRS CAP: ABT 900  MT IFO AND ABT 180 MT MGO

CLASS: BUREAU VERITAS I 3/3 E

CALL SIGN: 9 H J W 4
INMARSAT TELEX: 424908012 AWB AKRA X
VSL'S EMAIL TLX: 424908012.TLX@INMARSAT.FRANCETELECOM.FR
VSL'S EMAIL: akrathos@skyfile.com
VSL'S TELEPHONE: +870 763486349
VSL'S FAX: +870 763486351

INTNL GRT/NRT 16172/8573
SUEZ 16316,41/12959,45
PANAMA: 16082,63/12342,54

PORT OF REGISTRY VALETTA-REG NO 4101

1

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

Clause 29. – cont...

OWNERS: MOUNT IDI MARITIME LIMITED (MALTA), 18/2 SOUTH STREET-VALETTA-MALTA
MANAGERS:
ANBROS MARITIME SA -EX- ALL TRUST SHIPPING CO SA, 86, FILONOS STR.-7TH FLOOR
185 36 PIRAEUS
GREECE
PHONE: 210/4294063 (7 LINES)
TELEX: 211260-211261 ALL A/B ANBR GR
FAX: 210/4599733
EMAIL: INFO@ANBROS.GR
CABLE: AMSA PIRAEUS
WEB SITE: WWW.ANBROS.GR

P+I CLUB: THE "LONDON STEAM-SHIP OWNERS MUTUAL INSURANCE ASSOCIATION
LIMITED " MANAGERS : A.BILBROUGH & CO LTD

HMM: USD 5.000.000
INSURANCE BROKERS: ALSTON GAYLER & COMPANY LIMITED - LONDON
WAR RISK VALUE: USD 5 000 000.

IMO NO: 8018388
BV NO: 921989

GRAIN (MEASURED)/BALE(ESTIMATED)CAPACITIES
HO NO 1: 138045/133.557 CBFT
       2: 117739/108.151
       3: 182700/170.453
       4: 117926/108.405
       5: 182700/170.453
       6: 117926/108.405
       7: 178152/168.276
SPEED/CONS: ABT 12,50 KNT ON ABT 24 MT IFO CST 180 + ABT 3,0 MT MDO
AT PORT: IDLE: ABT 3,0 MT, W.CR.W. ABT 3,50 MT MDO + ALWAYS 1 MT MT IFO PER DAY
AT PORT.
*VESSEL USES MDO WHILST MANOEUVERING IN CONFINED WATERS, CANALS,
ENTERING/LEAVING PORTS ETC...

BUNKER SPECS
―――――
IFO 180 CST ISO 8217/96 RME
MDO DMB OR MGO RME 25/DMA (<0,2 % S)

DECK STRENGH:
HO NO    TTP   M.DECK   HA CVR
    1    17    3,5      1,75 MT/M2
    2    30     "         "
    3    19     "   .     "
    4    30     "         "
    5    19     "         "
    6    36     "         "
    7    19     "         "

HA CVRS TYPE: MCGRS FOLDING TYPE.
CFM HA CVRS NOT SIDE OPN'G N NOT SIDE ROLLING

HOLD DIMS INSIDE CORRUGATIONS:

1

7

<u>Additional Clauses to M.V. "Akrathos"</u>
<u>C/P dated 8ᵀᴴ March, 2004</u>

Clause 29. - cont...

| HO NO | LENGTH | BREADTH | HEIGHT | HEIGHT UNDER HA CVRS | | |
|-------|--------|---------|--------|--------|---|---|
| 1 | 20,40 | 16,70 | 12,00 | 12,80 MTRS | | |
| 2 | 12,30 | 21,80 | 12,47 | 13,35 | | |
| 3 | 19,60 | 21,80 | 12,47 | 13,35 | | |
| 4 | 12,20 | 21,80 | 12,47 | 13,35 | | |
| 5 | 19,60 | 21,80 | 12,47 | 13,35 | | |
| 6 | 12,40 | 21,80 | 12,47 | 13,35 | | |
| 7 | 19,60 | 21,80 | 12,47 | 13,35 | 2 | 30 |

<u>GEAR: LIEBHERR CRANES 4X16 MT TYPE B 16/20</u>
SITUATED BETWEEN HATCHES 1/2 - 3/4 - 4/5 - 6/7
MAX OUTREACH ABT 7,50 H.
JIB IN STOWD PSN: ONHEAD 5,5 AND IN BS 5,2 M ABT

CONSTANTS EXCL FW ABT 350 MT.
FW CAPACITY ABT 337 MT.
TPC 35,12 MT AT SUMMER MARKS.

- 4X5 CBM WITH MAX DENSITY OF 0,9, ROPE OPERATED/GROUND TOUCH MECHANICAL
  GRABS, DWT 4.5 MT.
- CO2 FITTED IN HOLDS.
- APPENDIX B FITTED(VIEW INSULATION AT AFT END OF HOLD NO 7 HER G/B IN HOLD
  CAP WILL BE REDUCED) OWNERS CALCULATED A LOSS OF ABOUT 25 CBM IN THE AFT
  PART OF HOLD NO 7 VIEW THE SPACE TAKEN BY THE INSULATION BULKHEAD TO BE
  BUILT.

- HOLDS EPOXY PAINTED.
- VESSEL NOT LAKES FITTED

PLUS CHARTERERS QUESTIONNAIRE AS BELOW:

- <u>NAME/TYPE(SD/ST/BC): AKRATHOS / BC</u>
- <u>PREVIOUS NAME: GALET</u>
- FLAG/PORT OF REGISTRY: MALTA / VALLETTA
- NATIONALITY OF CREW/ NBR OF CREW/NATIONALITY OF CREW AND OFFICERS/
  NAME OF MASTER: UKRANIAN / 26 / ALL UKRAINIAN / VLADIMIR CHERNYAKOV
- STATE NBR OF HOLD WHICH MAY BE LEFT SLACK WITHOUT REQUIRING
  BAGGING, STRAPPING AND SECURING: 1
- MONTH/YEAR BUILT/NAME OF YARD AND NUMBER: JAN 1981 / GEORGI
  DIMITROV, VARNA BULGARIA / 142
- CLASS / OFFICIAL CLASS REGISTER NBR / LLOYDS NBR (IHO NUMBER):
- BUREAU VERITAS / 921 G 89 / 8018388
- CFM VSL UNDER ENHANCED SURVEY PROGRAM: YES
- LOA/BEAM/LPB/MOULDED DEPTH: 184.6 / 22.80 / 172.0 / 14.15 MTRS
- DWAT/TPC DRAFT FULLY LADEN ON SSW: 25,817 MTS / 35.12 MTS / 10.56 MTRS
  DWAT/TPC ON 8M  FW: 16,214 / 33.03 MTS
  DWAT/TPC/DRAFT ON WINTER MARKS: 25,031 MTS / 34.94 MT / 10.34 MTRS
  DWAT/TPC/DRAFT ON TROPICAL MARKS: 26,550 MTS / 35.29 MT / 10.77 MTRS
  DWAT/TPC ON 32 FT SW: 22,972 MTS / 34.46 MT
  DWAT/TPC ON 28 FT SW: 18,799 MTS / 33.56 MT
- FWA ON VSLS SUMMER DWAT: 24.2 CM

3

8

Additional Clauses to M.V. "Akrathos"
C/P dated 8th March, 2004

Clause 29. - cont...

- CONSTANT EXCLUDING FW: ABT 350 MT
- DAILY FW CONSUMPTION/CAPACITY/IF VSL HAS EVAPORATOR STATE
  CAPACITY/NORMAL FRESH WATER RESERVES: 8 MT / ABT 337 MT / 4MT/DAY /
  NIL
- FWA FOR ALL FREEBORDS: 242 mm
- GRT/NRT(INTL)+ (PANAMA + SUEZ):
  GRT: 16,172 / NRT: 8,573
  SUEZ GRT/NRT: 16,316.41 / 12,959.45
  PANAMA GRT/NRT: 16,082.63 / 12,342.54
- DOES VSL HAVE BRITISH TONNAGE CERTIFICATE - AFFIRMATIVELY STATE
  GRT/NRT: N/A
- IS PANAMA DWAT AFFECTED BY VESSELS BILGE, TURN RADIUS: NO
- OWNERS P&I CLUB: THE "LONDON STEAM-SHIP OWNERS MUTUAL INSURANCE
  ASSOCIATION LIMITED", MANAGERS: A.BILBROUGH & CO LTD.
- GRAIN/BALE HOLD BY HOLD + TOTAL EXCLUDING WINGTANKS BUT INCLUDING
  COAMINGS:
               GRAIN (MEASURED) / BALE (ESTIMATED) CAPACITIES
         HO NO.    1: 138,045 / 133,557 CBFT
                   2: 117,739 / 108,151
                   3: 182,700 / 170,453
                   4: 117,926 / 108,405
                   5: 182,700 / 170,453
                   6: 117,926 / 108,405
                   7: 178,152 / 168,276

- DISTANCE FROM SHIPS RAIL TO HATCH COVERS/COAMINGS EACH SIDE: 5.70 M
  DISTANCE FROM BOW TO FWD OF HOLD 1 HATCH OPENING: 18.3 M
  DISTANCE FROM STERN TO AFT OF LAST HATCH OPENING: 43.5 M
  ARE HATCHES FITTED WITH CEMENT HOLES: NO
  CFH VSL STEEL FLOORED THROUGHOUT: YES
- SPEED + CONSUMPTION LADEN AND IN BALAST:
  SPEED / CONS: ABT 12.50 KNT ON ABT 24.0 MT IFO 180 + ABT 3.0 MT MDO
  GRADE OF IFO AND MDO USED:
  IFO 180 CST, ISO 8217/96 RME / MDO DMB or MGO RME 25/DMA (<0.2% S)
- DOMESTIC CONSUMPTION:
  PORT CONSUMPTION IDLE + WORKING BASIS 24 HRS:
  AT PORT: IDLE- ABT 3.0 MT, W.CR.W. ABT 3.50 MT MDO + ALWAYS 1.0 MT IFO
  PER DAY AT PORT.
- PERMANENT BUNKER CAPACITIES (IFO/MDO SEPARATELY): ABT: 800 MT IFO /
  180 MT MDO
- IS VSL FITTED WITH SHAFT GENERATOR: NO
- ENGINE MAKER AND TYPE/MAX OUTPUT BHP/RPH: SULZER 6RND76 / 12,000 @
  122 RPH
- NO OF HATCHES + DIMENSIONS: 7 HATCHES
  NO.1: 13.30 M X 10.00 H
  NO.2+4+6: 10.66 M X 11.44 H
  NO.3+5+7: 13.12 M X 11.44 H
- TYPE OF HATCHCOVERS: MCGRS FOLDING TYPE

4

<u>Additional Clauses to M.V. "Akrathos"</u>
<u>C/P dated 8th March, 2004</u>

Clause 29. – cont...

- NO.OF HOLDS+LENGTH OF HOLDS+BREADTH (FLAT TANKTOP SURFACE): 7
  HOLDS

NO.1: 17.45 M X 16.00 M (AT THE FORE END IT TAPERS TO 9,80 M)
NO.2: 10.60 M X 16.00 M
NO.3: 18.00 M X 16.00 M
NO.4: 10.60 M X 16.00 M
NO.5: 18.00 M X 16.00 M
NO.6: 10.60 M X 16.00 M
NO.7: 18.80 M X 16.00 M (6 M  FROM FORE BULKHEAD TAPERS TO 13,20 M)

- PLEASE CFM HOLD ARE FREE OF ALL OBSTRUCTIONS: YES
- STATE WHETHER CORRUGATIONS VERTICAL OR HORIZONTAL: VERTICAL
- MEASUREMENT OF ANY TANK SLOPES/HOPPERING (HEIGHT AND DISTANCE
  FROM VESSELS SIDE AT TANK (TOP): N/A
- HEIGHT FROM TANKTOP TO UNDER HATCH COVERS: 13.6 M
- HEIGHT FROM TANKTOP TO UNDER COAMINGS: 12.70 M
- CALL SIGN: 9HIW4
- SATCOM/TELEX: Inmarsat-C: 424908012 /
  Email: 424908012.tlx@inmarsat.francetelecom.fr / akrathos@skyfile.com
  Tel: 763486349
  Fax: 763486351
- MASTER'S NAME: VLADIMIR CHERNYAKOV
- CERTIFICATES

| NAME | DATE OF ISSUE | DATE OF EXPIRY | ANNUAL ENDORSM. |
|---|---|---|---|
| SPECIAL SURVEY | 15/04/2001 | 28/02/2006 | |
| LOADLINE | 09/04/2001 | 28/02/2006 | 22/04/2003 |
| SAFETY EQUIPM. | 09/04/2001 | 28/02/2006 | 22/04/2003 |
| GEAR SURVEY | 09/04/2001 | 28/02/2006 | 22/04/2003 |
| SAFETY RADIO | 13/08/2003 | 30/06/2004 | |
| INT'L OIL POLL. | 09/04/2001 | 28/02/2006 | 22/04/2003 |
| DERATIZATION | 20/10/2003 | 20/04/2004 | |
| OPA/COFR | 15/03/2004 | 15/03/2007 | |

- DO ANY RECOMMENDATIONS APPEAR ON ANY OF THE ABOVE CERTIFICATES: NO
- IF YES THEN STATE FULL DETAILS: N/A
- NAME OF UNDERWRITERS: H&M BROKERS: ALSTON GAYLER & Co. LTD., LONDON
- INSURED VALUE AND ANNUAL PREMIUM (THIS FOR CALCULATING EXTRA
  PREMIUM FOR BREACHING I.W.L.): USD 5,000,000
- EXPIRY DATE OF FMC CERTIFICATE: 15/03/2007
- GEAR-STATE:
  TYPE: CRANES
  NUMBER: 4
  WHERE SITUATED: BTWN HOLDS: 1+2 / 3+4 / 4+5 / 6+7
  HEIGHT OF CRANE PEDESTAL: ON HEAD: 5.5 MTRS / ON BASE: 5.2 MTRS
  HOW WINCHES POWERED: 380V / 60Hz
  CYCLES PER HOUR: 1.6 RPM
  LIFTING CAPACITY: 16 MT
  SLEWING / LUFFING / HOSTING SPEEDS: 1.6 RPM /  65M/MIN / 60M/MIN
  OUT REACH FROM SHIP'S SIDE: ABT 7.5 MTRS
  GRABS TYPE: 4 x MECHANICAL GRABS / DUAL OPENING SYSTEM
  IS GEAR COMBINABLE: NO

5

10

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

Clause 29, - cont...

TIME NEEDED FOR FULL CYCLE WITH MAXIMUM CARGO LIFT ON HOOK: 1.3 MIN.
- IS VESSEL FITTED WITH SUFFICIENT LIGHTS AT EACH HATCH FOR NIGHT WORK: YES
- MAX PERMISSIBLE UNIFORM LOAD ON TANKTOP/DECK/HCOVERS:

DECK STRENGTH (MT/M2):

| HONO TTP | M.DECKHA CVR | | |
|---|---|---|---|
| 1 | 17 | 3,5 | 1,75 |
| 2 | 30 | " | " |
| 3 | 19 | " | " |
| 4 | 30 | " | " |
| 5 | 19 | " | " |
| 6 | 36 | " | " |
| 7 | 19 | " | " |

- DOES VSL HAVE LOADMASTER COMPUTER / LOADICATOR OR OTHER TYPE OF MECHANICAL STOWAGE CALCULATOR: YES
- CONFIRM VSL IS STRENGTHENED FOR THE CARRIAGE OF HEAVY CARGOES AND ALSO SUITABLE FOR ALTERNATE HOLD LOADING: YES
- STATE NOS OF HOLDS WHICH MAY BE LEFT EMPTY WHEN OTHERS FULL (ALL COMBINATIONS): 1,3,5,7 OR 2,4,6
- CONFIRM FULL ITF OR BONE FIDE TRADE UNION AGREEMENT ACCEPTABLE ITF: N/A
- IF VESSEL HAS ITF AGREEMENT STATE NUMBER, DATE OF ISSUE AND EXPIRY DATE: N/A
- CONFIRM ENGINE/BRIDGE AFT: YES
- HAS VSL WINGTANKS (IF BLEEDING AND SUITABLE FOR CARGO STATE CUBIC CAPACITY): N/A
- CO2 FITTED IN ALL CARGO HOLDS/SMOKE DETECTION SYSTEM IN HOLDS: YES
- AUSTRALIAN HOLD LADDERS: YES
- NATURAL OR EL-VENTILATED(IF EL-V STATE NO OF AIRCHANGESPE HOUR BASIS EMPTY): NATURAL
- HAS VSL CARGOBATTENS (SIDE SPARRING): STATE NATURE OF SAME: NO
- PROPELLOR PITCH: NO
- BOWTHRUSTER HORSEPOWER: N/A
- CONFIRM VESSEL FITTED FOR CARRIAGE OF GRAIN IN ACCORDANCE WITH CHAPTER VI OF SOLAS 1974 AND AMENDMENTS INCLUDING UNTRIMMED ENDS WITHOUT REQUIRING BAGGING, STRAPPING, AND SECURING WHEN LOADING BULK GRAIN: YES
- CONFIRM VESSEL IS FULLY FITTED FOR PANAMA AND SUEZ CANALS: YES
- ST.LAWRENCE SEAWAY/GREAT LAKES SYSTEM IN ACCORDANCE WITH LATEST REQUIREMENTS OF THE RESPECTIVE AUTHORITIES: NO
- HEIGHT FROM KEEL TO HIGHEST POINT: 44.05 MTRS
- HEIGHT WATER LINE TO TOP OF HATCH COAMING (NBR 1 / MIDSHIP / LAST HATCH) WHEN:
    - FULLY BALLASTED (EXCL. HOLD N.4): 9.92 / 9.32 / 9.25
    - FULLY LOADED: 2.62 (EVEN KEEL)
- VSL NOT TO EXCEED 12.5 MTRS WLTHC AT ALL TIMES DURING LOAD: YES
- TOTAL BALLAST CAPACITY OF BALLAST TANKS: 9,941 MT WITH BALLASTING/DEBALLASTING SPEED IN MT PER HR: 400 CUB.M PER HOUR
- IS ANY OR ALL HOLDS FLOODABLE - AFFIRMATIVELY ADVISE QUANTITY OF WATER THAT THE HOLD(S) MAY TAKE AND ACCORDINGLY ADVISE: N/A
- WHAT IS MAX AIR DRAFT WITHOUT FLOODING HOLDS BUT FULLY BALLASTED: 34.8 MTRS

6

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8ᵗʰ March, 2004

Clause 29. - cont...

- MAX AIR DRAFT WITH FLOODING HOLDS AND FULLY BALLASTED: N/A
- IF HOLDS FLOODABLE ADVISE SPEED OF FLOODING/AND EMPTYING HOLD(S): N/A
- CAN THE MAST BE CUT AND FLOOD HOLD(S)/BALLAST TO REACH AN AIR DRAFT OF MAX 92': NO
- CONFIRM VESSEL SUITABLE FOR LOADING AT ANDERSONS TOLEDO OHIO USA FACILITY (BELIEVED TO HAVE AIR DRAFT OF 103 FT WOG): NO
- ELECTRICITY
  THE VESSEL SHALL PROVIDE ELECTRICAL POWER FREE OF COST TO CHARTERERS FOR OPERATION OF MAGNETS AND/OR GRABS TO EFFECT THE DISCHARGING DAY AND NIGHT 24 HOURS AT ALL HATCHES SIMULTANEOUSLY. POWER REQUIREMENTS FOR MAGNETS AND/OR GRAB OPERATION:
  A.C. 380 VOLTS, 3 PHASE, 60 CYCLES, 40 KVA PER HATCH/HOLD
- NAME + ADDRESS OF HEAD OWNING COMPANY + MANAGERS:
  OWNERS:
  MOUNT IDI MARITIME LIMITED
  18/2 SOUTH STREET, VALLETTA, MALTA
  MANAGERS:
  ANBROS MARITIME S.A.
  86 FILONOS STREET,185 36, PIRAEUS, GREECE
- LAST DRYDOCK (WHEN/WHERE/NATURE OF WORK PERFORMED):
  MAY 2004 / SHANGHAI, CHINA / ACCORDING TO CLASS STANDARDS FOR INTERMEDIATE SURVEY
- LAST 5 CARGOES CARRIED PRIOR TO DELIVERY + NAME OF CHRTRS:
  STEEL PRODUCTS / HARTECK
  CORN IN BULK / NOBLE
  WHEAT IN BULK / NAVITREK
  ROCK PHOSPHATE IN BULK / SSIPL
  MAIZE IN BULK / CONAGRA
- FULL STYLE OF AGENTS AT LAST PORT PRIOR TO DELIVERY:
  C.M.I. CHINA (SHANGHAI)
  18TH FLR. A. BLOCK B. 1089 PUDONG AVE.
  SHANGHAI 200135 – CHINA
  TEL: 00862168533795
  FAX:00862168550345
  EMAIL: cmi-china@cmi.net.cn
- LAST PORT STATE CONTROL INSPECTION (WHEN/WHERE/NATURE OF WORK PERFORMED):
  APRIL 2001 – COSTANZA, ROMANIA – ACCORDING TO CLASS STANDARDS FOR SPECIAL SURVEY
- LAST PORT STATE CONTROL INSPECTION (WHEN/WHERE/PROBLEMS IF ANY) VSL PASSED WITHOUT RECOMMENDATION OR DETENTION: AQABA, JORDAN – 29/12/03 – NO DEFICIENCIES
- CASUALTY AND POLLUTION HISTORY: NONE, SINCE MAY 1997 WHEN PURCHASED
- COLLISIONS,GROUNDINGS,POLLUTION,OIL/BUNKER SPILLS AND OTHERS: NONE, SINCE MAY 1997 WHEN PURCHASED
- FIRE,CARGO DAMAGE ETC. OVER LAST TWO YEARS: NONE
- DOES VSL AND/OR OWNERS CARRY AN ACCREDITED ISM (INTERNATIONAL SAFETY MANAGEMENT) CERTIFICATE: YES
- IF YES, WHO WERE THE AUDITORS: ABS
  PLS FAX US A COPY OF BOTH CERTIFICATES
- CURRENT OWNERSHIP: MOUNT IDI MARITIME LIMITED
- HOW LONG HAS VSL BEEN IN CURRENT OWNERSHIP: 7 YEARS
- IF LESS THAN 2 YEARS PLSE ADVISE FORMER OWNER STYLE AND TIME VSL WAS WITH THAT OWNERSHIP: N/A

7



12

<u>Additional Clauses to M.V. "Akrathos"</u>
<u>C/P dated 8th March, 2004</u>

Clause 30. - cont...

BENEFICIARY: ANBROS MARITIME S.A.

CORRESPONDENT BANKS IN US:
AMERICAN EXPRESS BANK LTD, N.Y, USA
A/C NO.: 717066
SWIFT CODE: AEIBUS33

OR

BANK OF NEW YORK, N.Y, USA
A/C NO.: 890-0055-561
SWIFT CODE: IRVTUS3N

Clause 31.

Referring to lines 60 & 61, where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or agents, Owners shall notify Charterers in writing whereupon Charterers will have three banking days to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

Clause 32.

Charterers to have the right to withhold from charter hire during the period of this charter such amounts due to undisputed off-hire. Charterers to have the right to withhold from last hire payments the value of the estimated quantity of bunkers on redelivery. However, final accounting to be arranged by Charterers as prompt as possible.

Clause 33.

In the event of the vessel being boycotted by I.T.F. delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, Ownership, crew, terms of employment of Officers or crew or any other vessel under the same Ownership, operation or control, all time lost is to be considered as off-hire and any direct expenses incurred thereby to be for Owner's account.

Clause 34.

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra direct expenses shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents or their employees, or by reason of cargo carried.

Clause 35.

Any delay, expense and/or fines incurred on account of smuggling to be for Owners' account unless caused by Charterers and/or their agents and/or their employees.

Clause 36.

Charterers to have the option to add any off-hire time to the charter period.

9

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8ᵗʰ March, 2004

**Clause 37.**

Any delay, direct expense by reason of non-compliance with regulations, lack of proper documentation or equipment as per clause 29 and 45 to 49 or on any breach of said clauses to be for Owner's account.

**Clause 38.**

If Stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with clause 49 or because of lack of said certificates, any time so lost shall be treated as off-hire, and all extra expenses incurred, directly resulting from such failure shall be for Owners' account.

**Clause 39.**

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off-hire shall be for Owners' account.

**Clause 40.**

If for any reason whatsoever the vessel will be off-hire or is reasonably estimated to be off-hire for 30 (thirty) days, Charterers have the option to cancel the balance of this Charter Party, if the vessel is cargo free.

**Clause 41.**

At or off loading and/or discharging ports crew to open and close the hatches, if when and where required if permitted by local regulations weather/sea state permitting otherwise for Charterers' account. Charterers or their agents to apply and Master to follow instructions given in this respect. Stevedore standby expenses due to late opening of hatches by fault of crew to be for Owners' account. During such period vessel is considered off-hire pro-rata with number of hatches workable.

Crew's overtime to include the following services:

1. Raising and lowering cranes in preparation for loading and/or discharging operations.
2. Removing and replacing beams in preparation for loading and/or discharging operations.
3. Supervision of loading and/or discharging operations.
4. Maintaining necessary power and light while loading and/or discharging
5. Warping ship when and where required.
6. Docking and undocking.
7. Bunkering.
8. Crew to assist in collecting and bundling of dunnage in the holds.
9. Deleted.
10. Opening and closing of hatches.
11. If required by the Charterers the Master to take maximum ballast to keep freeboard lowest possible to facilitate cargo handling operations provided trim permits.

**Clause 42.**                                                        BUNKERS

Vessel to be delivered with bunkers as on board with about same quantities and prices on delivery/redelivery. Prices to be mutually agreed after Owners have advised quantities. Delivery value of bunkers on board on delivery to be paid together with first hire payment. Charterers option to supply/bunker RMF fuel in South Africa or Brazil, but only if no RME is available.

15

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

**Clause 53.**

Extra Insurance, if any, owing to vessel's age and/or class and/or flag, to be for Charterers' account.

**Clause 54.**

In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, C.I.S. Communist China, United Kingdom, Japan, Greece, France, Germany, both Charterers and Owners, have the option of cancelling this Charter Party.

It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of a limited local conflict.

**Clause 55.**

The Basic Annual War Risks Insurance premium on the vessel's hull and machinery value and present war bonus to the master, Officers and crew are for Owners' account, but any increase of same due to vessel's trading into an excluded are to be for Charterers' account. Vessel's Hull and machinery value: US$ 6,000,000.

**Clause 56. Bills of Lading/Cargo Claim**

This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause and "Baltime 1939" War Clause as attached, which are to be incorporated in all Bills of Lading issued under this Charter. All Bills of lading issued under this Charter will incorporate the General Paramount Clause as attached.

**Clause 57. Trade Exclusions**

CIS Pacific, Australia, New Zealand, Tasmania, Campuchea, Mururoa, Fiji, Cuba, Lakes, Halifax EC Canada, Sweden, Finland, Norway, Denmark, Turkish Occ Cyprus, Israel, Lebanon, Eritrea, Somalia, Maldives, Sierra Leone, both Congoes, Sri Lanca (except Colombo/Trincomalie), Yemen, Iraq, Liberia, Angola, Ivory Coast, North Korea, State Of California, Haiti and all war affected countries. Yemen ok but Charterers always to remain solely responsible for cargo claims at Yemen ports also when asked to provide required guarantees. Iraq ok but only for UN approved cargo and provided Vessel's War Underwriters allow the vessel to trade there and charterers pay all extra insurances and crew bonuses. Also time used for UN sea inspections to be at their time/expense. Liberia to be allowed when civil war ends. Direct trade between China and Taiwan allowed provided that if needed Charterers will arrange at their time/expense all arrangements/ intermediate calls/documentation.

Trading always within safe, ice free ports, always within Institute Warranty Limits except NAABSA as per NYPE printed form. Vessel able to break IWL when allowed by vessel's underwriters against Charterers payment of AIP as per Lloyd's of London scale and trade to ice bound ports in Baltic/Sea of Azov/St. Lawrence in accordance with her ice class but never to be ordered to break ice only follow ice breakers.

**Clause 58. Cargo Exclusions**

Radioactive products and waste, nuclear materials-devices, acids, polutants, asphalt-pitch-tar in bulk/drums, arms, ammunitions, explosives, livestock, hides, naptha in drums, petroleum products in barrels/drums, bulk borax, HBI, asbestos, caustic soda, ammonium nitrate (ammonium nitrate fertiliser grade is not excluded), caldum carbide, creosoted goods, cotton

12



20/12 2005 16:34 FAX +30 2108994493    PRIAMOS MARITIME    ☒007

## Additional Clauses to M.V. "Akrathos"
## C/P dated 8th March, 2004

**Clause 58. Cargo Exclusions – cont...**

seeds expellers, copra, drugs, sulphur, illegal immigrants, ferrosilicon, sponge iron in bulk, all kinds of oily scrap-turnings-motorblocks, logs, silicon manganese, fishmeal, gaseous coal, oily petcoke, salt, oily expellers, nefeline syenite, pesticides, resins, drip, industrial waste, bulk cement, dirty slags, dangerous fertilisers, soda ash-titanium slag requiring very good cleaning, concentrates unless loaded as per IMO regulations, and all excluded cargoes as per IMO BC code as specified by vessel's class or all cargoes for the carriage of which IMO BC code requires structural alterations in the hull of the vessel. Until otherwise changed all cargoes to/from any country against which united nations have imposed sanctions and are/or owned/controlled by terrorists/organised crime/money laundering.

IMO Appendix B cargoes are permitted.

Last cargo to be loaded under this Charter Party to be a clean one.

Owners are obliged to deliver and keep the vessel and her crew and anything pertaining hereto supplied with up-to-date and complete certificates, approvals, equipment and fittings, enabling the vessel and her crew to load, carry, discharge all cargoes permitted under this Charter Party including coal in bulk.

Charterers undertake that at their time/cost Charterers to install in vessel's holds equipment/devices required for the loading of any cargo, over and above the fittings/equipment the vessel has, including in compliance with IMO Appendix B requirements as stated in Owners class e-mail.

Charterers option to load 'sulphur, salt' but only 3 (three) times for both commodities (i.e. if three times sulphur but no salt or two salts one sulphur etc..) during this Charter Party but never as the last cargo and provided Charterers before the commencement of loading protect vessel's holds with the latest protective coating at their time/expense and also clean her holds thoroughly after discharge. Vessel on her delivery will have her holds sandblasted and epoxy paints coated.

**Clause 59. Redelivery Clause**

Redelivery delivery last outward sea pilot (or passing as applicable) safe port within following ranges Aden/Japan range including Indonesia, Philippines, Malaysia, Thailand, China, Korea, Taiwan or Skaw/Med range excluding Scandinavia but including Baltic, Ireland, UK, Black Sea, or Boston/Bahia Blanca range including Central America and Caribbean Island or Beira/Saldanha Bay range, or Dakar/Luanda range or Vancouver/Valparaiso range port in Charterers option any time day or night Sundays and Holidays included.

Charterers to give Owners the following notices:
30 days approximate notice of redelivery date and area.
15 days approximate notice of redelivery date and port.
5 days approximate notice of redelivery date and port.
3/2/1 days definite notice of redelivery date and port.

**Clause 60. Stevedore Clause**

Charterers will not be held responsible for damages to the vessel unless notified in writing by the Master at the time of occurrence of damage or latest prior sailing port damage occurred. Master to co-operate with Charterers and agents in giving prompt notice of claim in writing to party causing same latest before sailing. Upon each occurrence of serious damage Master to immediately inform Charterers by telex or fax stating exact description and exact extent of such damage and provided that it is practical a joint survey to be held, the expenses of which to be shared 50/50 between Charterers and Owners.

**Additional Clauses to M.V. "Akrathos"**
**C/P dated 8th March, 2004**

Clause 60. Stevedore Clause – cont...

Master to use his best efforts to obtain written acknowledgement by responsible parties causing damages unless damage be made good in the meantime by Stevedores otherwise Charterers are not held responsible. Hidden damages to be notified immediately upon discovery but in any case not later than on completion of the voyage.

It is understood that if Master delivers any notices or correspondence for the Charterers, third parties or stevedores to the Charterers' agent for onward delivery to the responsible party, that such delivery shall fulfil the master's obligation to inform the responsible party(ies) of damage.

Damages affecting vessel's class or seaworthiness or the proper working of the Vessel and/or her equipment to be repaired by Charterers at their time and expense as soon as occurred or in any case prior to redelivery. Other minor damages to be listed in the off-hire survey report and Owners to be compensated on the basis of an estimate of the cost of repairs by the off-hire surveyor.

Clause 61. Deleted.

Clause 62. Ballasting Clause

Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity in order to bring down vessel's height to get into position under loading and/or discharging appliances, however, always in conformity to free board and/or safety requirements.

Clause 63. Agency Clause

Charterers agree to have their agents attend to normal ship's husbandry as Owners' agents without extra agency fee. Except in case of any extraordinary services such as crew member desertion or hospitalisation, general average, major repairs and other similar major items. In such cases Owners shall appoint their own agents or pay Charterers' agents the relevant agency fee.

Clause 64.

For the purpose of computing hire payments, time of delivery/redelivery to be adjusted to G.M.T. but laycan to be based on local time.

Clause 65.

Charterers to have the right to use their own Bills of Lading with reference to line 78/79 of the Charter Party. Charterers and/or their agents are authorised by the Owners to sign on Owners' behalf all Bills of Lading as presented and after pre-loading survey by P & I club Surveyor in accordance with mate's Receipts without prejudice to this Charter Party. Cargo remarks on mate's Receipts to be qualified and quantified. Master to advise intended remarks as the daily tally figures are presented and Supercargo, if attending, to be kept informed prior to remarks being recorded. Charterers to indemnify Owners for any differences in the  remarks between Bills of Lading and Mate's Receipts. Charterers to submit full details of cargoes booked prior to loading at each port.

14

19

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

**Clause 66.**

The Charterers have the privilege to double bank the vessel, i.e. may order the vessel alongside any other vessel and vice versa. However, all additional costs/arrangements (including arrange fenders to put between vessels) time/responsibility arising from this double bank operation to be for Charterers' account and Charterers to provide other vessel's Masters' prior written approval. Charterers also to reimburse any additional premium payable by Owners to cover such operation(s) under their hull and machinery and loss of hire insurance.

Double banking operation should be carried out provided weather permitting and Master will have discretion to stop the same if he feels unsafe to continue same.

**Clause 67.**

Charterers to appoint an independent surveyor which to be approved by Owners on their behalf for performing a Joint on-and off-hire bunker and condition suvey. Joint on-hire survey to be in Charterers time and Joint off-hire survey to be held in owners time. Expenses to be shared equally. 

**Clause 68. In lieu of hold cleaning**

Charterers to pay Owners US$ 4,500 lumpsum including removal/disposal of dunnage/lashing materials upto her main deck but cost of taking dunnage/lashing materials ashore whether compulsory or not to be done at Charterers time/cost.

Intermediate hold cleaning US$ 3,500 lumpsum/per voyage payable to Owners with hire and owners/vessel will not be responsible if vessel fails to pass survey due to hold cleanliness at the next port of loading. Owners undertake that Master/Crew will act in same manner as if the intermediate cleaning was undertaken for Owners account. Charterers option to declare Intermediate sweeping instead, provided such sweeping is not excessive, in which case Charterers to pay US$ 2,000 lumpsum/per voyage payable to Owners with hire. Owners undertake that Master/Crew will act in same manner as if the intermediate sweeping was undertaken for Owners account. 

**Clause 69.**

Any taxes and/or dues on the vessel, due to crew shall be for Owners account. Any taxes and dues on cargo or freight or Charter hire to be for Charterers account.

**Clause 70.**

Any dispute arising under the Charter to be referred to Arbitration in London. One Arbitrator to be nominated by the Owners and the other by the Charterers, and in case the Arbitrators shall not agree then to the decision of an Umpire to be appointed by them, the award of the Arbitrators or the Umpire to be final and binding upon both parties.

If neither of the appointed Arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new Arbitrator in his place.

If one party fails to appoint an Arbitrator, either originally, or by way of substitution as aforesaid, for eight clear days after the other party having appointed his Arbitrator has served the party making default with notice to make the appointment, the party who has appointed an Arbitrator may appoint that Arbitrator to act as sole Arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. All Arbitrators are to be conversant with shipping matters.

15

20

r

### Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

Clause 70. – cont...

For claims of US$ 50,000.00 or less, the Small Claims Procedure of the LMAA to be used.

English Law to apply.

Clause 71.

Gangway watchmen always to be for the account of the party appointing same unless compulsory in which case they are to be for Charterers' account.

Clause 72.

Charterers have the privilege of flying their own house flag.

Clause 73.

The Charterers shall have the option to superficially inspect the vessel at any time during the period of the Charter Party and the Master/Officers and crew to render all necessary co-operation.

Clause 74.

On arrival first load port vessel to be clean swept, fresh water washed and dried up and ready to receive Charterers intended cargoes in all respects, free of salt, loose rust scale and previous cargo residue to the satisfaction of local, relevant Surveyors.

Should the vessel not be approved by relevant Surveyors as Charterers' intend cargo cleanliness, full self trimming bulk carrier and fully equipped for the loading according to SOLAS regulations, the vessel to be placed off-hire from the time of rejection until the vessel is fully accepted and any expense/time incurred thereby for Owners' account.

Clause 75.

The Owners to give Charterers notice of delivery on fixing and followed by 15/10/7/5 days of approximate and 3/2/1 days definite notice.

Clause 76.

Owners to provide valid 'Gypsy moth free certificate'. Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plant Protection Division and U.S.D.A. Plant Protection and Quarantine Office Regulations concerning the Asian Gypsy Moth. Furthermore Owners guarantee that the vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life. Should the vessel be found to have same, vessel to be considered off-hire until the vessel has been passed/cleared by Canadian/U.S. authorities. All costs, consequences, losses, damages including but not limited to loss of sale/purchase to be for Owners' account.

Clause 77. Deleted.

Clause 78. Deleted.

Clause 79. Deleted.

16

21

## Additional Clauses to M.V. "Akrathos"
## C/P dated 8th March, 2004

**Clause 80.**

All cargo claims to be settled in accordance with Interclub Agreement as Amended 1984 or any later amendments.

In any case, the time bar for any cargo claim to be 12 months from date of discharge.

**Clause 81.**

This Charter Party to be interpreted in accordance with English Law.

**Clause 82.** Deleted.

**Clause 83.**

Owners state that no valid ITF agreement for the vessel is available on board, but Owners will remain responsible for crew matters/their employment terms covering all ports or places of call allowed under this Charter Party.

**Clause 84.**

Owners to allow Charterers to discharge full cargoes without presentation of original Bill(s) of Lading by providing with Letter of Indemnity in accordance with Owners' P & I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only, but all Bills of Lading to be issued in strict accordance with Mates Receipts. No liner/through /transhipment/incorporating Hamburg Rules Bills of lading to be allowed/signed/issued under this Charter Party.

**Clause 85.**

The Vessel has an International Gear Certificate which complies with UK/USA Dock regulations and all other international regulations and laws. In the event of any delay caused by failure to produce such valid certificate Charterers may suspend hire for the time lost and Owners to pay all extra direct expenses additional to and resulting from such failure.

*off hire*

**Clause 86.**

Charterers have the free use of vessel's cranes/grabs using qualified shore labour to operate cranes/grabs without expense to Owners. Any time lost due to inefficiency, respectively breakdown of cranes/gear to be deducted from the hire pro-rata for the period of such inefficiency in relation to the number of hatches affected. Owners guarantee vessel is suitable for grab discharging/rubber tyred or with protected steel belt bulldozer operation upto her tanktop strength with no obstructions/pillars in vessels holds.

**Clause 87.**

No deck cargo.

**Clause 88.** Deleted.

17

22

### Additional Clauses to M.V. "Akrathos"
### C/P dated 8th March, 2004

Clause 89, Ocean Route Clause

Charterers may supply 'Ocean Routes' or 'Fleet Weather' advice to the Master throughout the voyage specified by the Charterers. The master to comply with the reporting procedure of routing service, but it is understood that final routing is always at Master's discretion for safe navigation and choice of route. For the purpose of this Charter Party 'good weather condition' is to be defined as weather conditions in wind speeds not exceeding Beaufort force 4-Douglas Sea State 3, evidence of weather condition to be taken from the vessel's deck logs and independent weather bureaus reports. In the event of a consistent discrepancy between the independent weather bureaus reports shall be final and binding by both parties. Adverse currents/swell to be taken into consideration.

Clause 90.

Vessel's holds on delivery/arrival at first loading port to be clean swept/washed down by fresh water and dried up so as to receive Charterers intended cargo in all respects, free of salt, loose rust scale and previous cargo residue to the satisfaction of local/relevant surveyor. Should the vessel not be approved by the relevant surveyors as Charterers intention cargo cleanliness, full self trimming bulk carrier and fully equipped for the loading according to SOLAS regulations, the vessel to be placed off hire from the time of rejection until the vessel is fully accepted and any expenses/time incurred thereby for owners' account.

Owners guarantee vessel's hatch covers to be absolutely watertight all through this Charter period and if any hatch cover is found defective, same to be rectified at Owners time and expense to Charterers satisfaction.

Hatch test:
Charterers to have the option to hose test or ultrasonic test the vessel's hatch covers at loading port(s) at their time/expense and should same not be water tight, Owners have the obligation to arrange necessary measures in order to make the hatch covers fully water-tight at Owners time and expense to Charterers satisfaction.

Clause 91.

Owners warrant vessel and Owners are fully ISM and P & I covered and classed with IACS member throughout the duration of this Charter Party.

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense, liability or delay caused by failure on the part of the Owners or "the company" to comply with the ISM Code shall be for the Owners' account and agree to harmless and indemnify Charterers accordingly.

Clause 92.

The Charterers have the liberty to fit/weld pad-eyes for securing of cargo at their risk and expense and to Master's discretion which not to be unreasonably withheld. On redelivery such pad-eyes to be removed at Charterers' expense and in their time or at Charterers' option the vessel will be redelivered without removing pad-eyes paying Owners US$ 15.00 per pad-eye. Pad-eyes to be welded in holds only, but not on top of tanks.



18

## Additional Clauses to M.V. "Akrathos"
### C/P dated 8ᵗʰ March, 2004

**Clause 92. – cont...**

Charterers are entitled to use lashing material as on board but are to return same upon redelivery. Fair wear and tear always expected. Any additional lashing material required to be for Charterers' account.

**Clause 93.**

The vessel to maintain speed and consumption described in this Charter party during the whole charter period, subject to weather conditions.

**Clause 94. Hamburg Rule Clause**

Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on Charterers' behalf or on behalf of any Sub-Charterers) incorporating, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of the Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**Clause 95. Deleted.**

**Clause 96. Ad Valorem Bills of Lading**

No Bill of Lading containing a declaration of value of goods in excess of US$ 2,500.00 per package, piece or unit shall be issued under this Charter Party without Owners' prior written consent.

**Clause 97. BIMCO Stowaway Clause for Timecharterers**

A)
(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(B)
(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.




19

24

r

## Additional Clauses to M.V. "Akrathos"
## C/P dated 8th March, 2004

Clause 97. BIMCO Stowaway Clause for Timecharterers – cont....

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

Clause 98. BIMCO Standard Year 2000 Clause for Voyage and Time Charter Parties

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000

Without prejudice to their other rights, obligations and defences under this Charter Party including, where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

Clause 99.

Owners confirm vessel has not been detained by any E.C.C. countries during the last 24 months and has no outstanding deficiencies from the port state controls. Otherwise please advise where and for what reason.
Owners guarantee that the terms and conditions of employment of the crew of the vessel for the period of this Charter Party are covered by a bona fide trade union agreement acceptable to I.T.F.

Clause 100.

Owners confirm vessel has no centre line beams/bulkheads or any other obstruction on decks or holds which would interfere with loading/discharging operations and use/or use of bulldozers/pay loaders.

Clause 101. Deck Cargo

Deck loading to be at Charterers' risk/expense. Bills of lading for deck cargo to be claused "carried on deck at Shippers' risk without any liability to the carrier".

Clause 102. Unique Bill of Lading Clause (in case trading to U.S.A. contemplated)

It is hereby mutually agreed that in accordance with the United States Customs Regulations applicable from 1st April, 1989, that if vessel is trading to ports in the United States of America, it is Charterers' responsibility to provide their own "unique bills of lading" with their own identifier carrying code, a four digit standard carrier alpha code (SCAC).

Clause 103. Bunker Quality

The Charterers shall supply fuel of the following specification:

IFO 180 CST:   BSMA M6 equivalent to ISO 8217:1987 – RME 25
MDO:           M2 equivalent to ISO 8217: DMB

20

25

## Additional Clauses to M.V. "Akrathos"
## C/P dated 8th March, 2004

**Clause 103. Bunker Quality – cont...**

The chief engineer to co-operate with the Charterers' bunkering agents and fuel suppliers and comply with their requirements during bunkering including but not limited to checking, verifying and acknowledging readings or sounding meters, etc. before, during and/or after delivery of fuel. Three (3) samples of all fuel to be taken during delivery by suppliers in the presence of the chief engineer, sealed and signed by the suppliers, chief engineer, and Charterers' agent, each of whom should retain one sample.

**Clause 104. Steel Survey**

In case loading steel/steel products pre-loading joint survey on cargo condition to be carried out. Survey fee to be shared equally. Surveyor to be mutually agreed between Owners and Charterers.

**Clause 105. Steel Coils**

In case steel coils are loaded, Charterers shall provide at their time and expense all necessary lashing and dunnage materials of sufficient thickness, size, and quantity to satisfy the Master and to properly protect the cargo and vessel's tank tops.

**Clause 106. Charterers' Supplies**

In no event shall Charterers procure or permit to be procured for the vessel any supplies, necessaries, or services without previously obtaining a statement signed by an authorised representative of the furnisher thereof acknowledging that such supplies, necessaries, and services are being furnished on the credit of Charterers and not on the credit of the vessel or of her owners and that the furnisher claims no maritime lien on the vessel therefore.

### I. BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servant of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

21

<u>Additional Clauses to M.V. "Akrathos"</u>
<u>C/P dated 8th March, 2004</u>

BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
CODE NAME: "CONWARTIME 1993"

cont...

(4)

(A) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(B) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(A) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions.

(B) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(C) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

(D) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier.

(E) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

23

27

<u>Additional Clauses to M.V. "Akrathos"</u>
<u>C/P dated 8th March, 2004</u>

BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
CODE NAME: "CONWARTIME 1993"

cont...

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charterparty.

### GENERAL CLAUSE PARAMOUNT

All Bills of Lading issued under this Charter Party shall contain the following clause;

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels 25th August 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any terms of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of liability.

### P & I NUCLEAR CLAUSE

Notwithstanding any provision whether written or printed contained in this Charter it is agreed that nuclear fuels or radio active waste or products are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

### USA CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the Unites States approved April 16th, 1936 which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent such term shall be void to that extent but no further.

### CANADIAN CLAUSE PARAMOUNT

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Carriage of Goods by Water Act, 1970, Revised Statutes of Canada, Chapter C-15, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent but no further.

24

28